James E. Barton II, 023888
Jacqueline Mendez Soto, 022597
Daniella Fernandez Lertzman, 037943
**BARTON MENDEZ SOTO PLLC**
401 W. Baseline Road, Suite 205
Tempe, Arizona 85283
480-550-5165
James@bartonmendezsoto.com
Jacqueline@bartonmendezsoto.com
Daniella@bartonmendezsoto.com
*Attorneys for Non-Party Francisco Pastor-Rivera*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julieta Bencomo, et al., | Case No.: 2:90-cv-0369-PHX-GMS |
| Plaintiffs, | **NOTICE OF POSITION OF FRANCISCO PASTOR-RIVERA** |
| v. | |
| Phoenix Union High School District No. 210, et al., | (Assigned to Hon. G. Murray Snow) |
| Defendants. | |

Per the Court's October 25, 2024, Order (Doc. 136), Candidate Francisco Pastor-Rivera, by and through undersigned counsel, submits this position statement to identify his preferred remedy, which is that the Court lift its injunction against canvassing the November 5, 2024, election for the Phoenix Union High School District Governing Board, and allow the will of the voters expressed in that election to stand, and not require a special election nor establish any procedures for such a special election.

**MEMORANDUM**

By the time the Court held its hearing on this matter, Maricopa County had already printed ballots that violated the consent decree, and voting those ballots had begun. It was thus, as remains the case, impossible to comply with the Amended Consent Decree (Doc. 111). The Consent Decree does not permit voters during a regularly scheduled election to vote for two candidates for the two at-large seats, nor does it allow conducting the school board election during a special election. No matter what the Court orders, the Decree will not be satisfied for this particular election.

Arizona law provides a remedy for challenging the conduct of an election after the fact. Election contests are covered in Title 16 of the Arizona Revised Statutes. Absent any action compliant with Consent Decree, the Court should abstain from preempting Arizona law on this matter. The instant case would not likely satisfy the criteria for an election contest, but this is precisely the reason the Court should leave the results of the November 2024 election in place. State law would do so.

Furthermore, the Court should revisit whether this unintentional noncompliance with a consent decree constitutes the "broad-gauged unfairness" that justifies a federal court invalidating the results of a state election. Candidate Pastor-Rivera asserts that such analysis, at a minimum, supports leaving Arizona law in place.

Finally, the purpose of the consent decree has been satisfied in this election. Hispanic voters were able to select a candidate of their choosing. The Voting Rights Act specifically targets certain historically marginalized voting blocs, and previously provided

extra scrutiny in certain jurisdictions with a history of discrimination. That goal was satisfied in the November 2024 election.

I.      **Factual Background**

The results of the election have been canvassed and reveal a relatively close race for Phoenix Union High School District.

### Phoenix UHSD #210-GBM-4yr (Vote for 2)

|  | Total |  |
|---|---|---|
| Times Cast | 222,719 / 316,441 | 70.38% |
| Undervotes | 176,538 |  |
| Overvotes | 1,576 |  |

| Candidate | Party | Total |  |
|---|---|---|---|
| CROSS, DEBBIE | NON | 67,236 | 25.15% |
| MÁRQUEZ, AARON | NON | 69,215 | 25.89% |
| PASTOR-RIVERA, FRANCISCO ISAAC | NON | 71,943 | 26.91% |
| RAMIREZ, ADEN | NON | 55,987 | 20.94% |
| Write-in |  | 2,943 | 1.10% |
| Total Votes |  | 267,324 |  |

*See Maricopa County: Election results*, available at

https://elections.maricopa.gov/results-and-data/election-results.html

(follow "2024 November General Election Results.pdf" hyperlink) (last visited 11/25/24).

Of the 222,719 voters who cast votes in this election, 176,538 were undervotes, that is voting for only one candidate. Also, 1,576 voted for three or more candidates, while 44,605 individuals voted for two candidates. This number can be arrived at by either

subtracting the total number of overvotes and undervotes from 222,719 (the total ballots for which there was a vote in this race), or by similarly subtracting the total number of overvotes and undervotes from the 267,324 (the total votes cast in the race) and dividing that number by two. Either method demonstrates that 44,605 ballots or approximately 20% of the voters voting in this race, chose two candidates. As all parties stipulate to, instructing and permitting two votes for the at-large seats violated the Amended Consent Decree. (Doc. 111).

The Amended Consent Decree (Doc. 111) was entered into for the protection of the voting rights of "African-American and Hispanic (collectively, 'minority,' and who are known for the U.S. Census Bureau purposes as 'Black' and 'Hispanic')" voters. [Doc. 111 at 1-2.] The Decree identifies the following problem, "despite a substantial minority voting population (and a minority enrollment in PUHSD schools approaching fifty percent), the at-large election barrier in conjunction with racially polarized voting has enabled the Anglo majority usually to defeat the chosen candidates of minority voters." [*Id.* ¶19.] The Decree references this within its discussion of the evils addressed by the Voting Rights Act, noting that "[t]his Court has an obligation to eliminate and prevent violations of the Voting Rights Act. [*Id.* ¶ 24.] Thus, it is appropriate to evaluate the present case data for the criteria used to evaluate compliance with the Voting Rights Act.

A majority of the population of the Phoenix Union High School District is Hispanic, 56.8%. [Notice Regarding Demographic Data, Ex. 1 (Doc. 127-1)] A majority of the voting age population, 51.8%, but only a plurality, 44.2%, of those eligible to vote

are Hispanic. [*Id.*] Department of Justice Regulations concerning the previous preclearance system encourage evaluation of the above data as well as that of the race or language group of each candidate. *See* 28 CFR § 51.28(a), (d). In the instant case, the top vote getter and lowest vote getter were both Hispanic.

Returning to the Consent Decree, it provides one specific remedy to address selecting candidates for the at-large seat. Those seats shall be "elected together in a single race through a two-seat 'limited voting' system, whereby each voter will be entitled to cast only one vote for the candidate of his or her choice for the two at-large seats at stake. The two candidates with the highest vote shall be elected." (Doc. 111 ¶32.) This is the only remedy called for the Decree. There is no provision for holding a special election.

Candidate Pastor-Rivera is aware of no evidence to suggest that either of the losing candidates would have prevailed had the instructions complied with the consent decree. Nor is Candidate Pastor-Rivera aware of any evidence that for this election, minority voters were denied the ability to select a candidate of their choosing; specifically, he is aware of no evidence that had the 44,605 multi-candidate voters voted for only one candidate that this would have tipped the election toward or away from the will of African-American or Hispanic voters.

**II.    Argument**

    **A.    Arizona law provides a mechanism to challenge the election.**

No perfect remedy exists. It is impossible to conduct the November 2024 General Election again, but with the proper instructions given to the voters in Phoenix Union High

1   School District that would be compliance with paragraph 32 of the Consent Decree.
2   Holding a special election is not contemplated by the Decree. And, in fact, it is among the
3   changes that would have required pre-clearance prior to *Shelby Cnty., Ala. v. Holder*, 570
4   U.S. 529 (2013). 28 C.F.R. § 51.17. Special elections will by definition result in a different
5   set of voters—likely a smaller subset of voters—than those who voted in the 2024 election
6   which included the election of the President of the United States. Holding a special
7   election is a dramatic remedy that is not provided for in the Decree.
8           In the absence of a remedy available in the Decree, the Court should turn to the
9   remedy provided in Arizona law. Chapter 4, Article 13 of Title 16 provides a vehicle for
10  contesting an election that has already happened.

> An elector of a county, city, town or a political subdivision of such county, city or town, may contest the right of a person declared elected to an office to be exercised therein, or declared nominated to an office at a primary election, or a question, proposal, measure or proposition submitted to and voted on by the electors on the same grounds and in the same manner as contests of election to a state office or question, proposal, measure or proposition submitted to the vote of the electors of the state.

A.R.S. § 16-674(A). The reason for the contest may be any of the following grounds:

> 1. For misconduct on the part of election boards or any members thereof in any of the counties of the state, or on the part of any officer making or participating in a canvass for a state election.
> 2. That the person whose right to the office is contested was not at the time of the election eligible to the office.
> 3. That the person whose right is contested, or any person acting for him, has given to an elector, inspector, judge or clerk of election, a bribe or reward, or has offered such bribe or

>  reward for the purpose of procuring his election, or has committed any other offense against the elective franchise.
>  4. On account of illegal votes.
>  5. That by reason of erroneous count of votes the person declared elected or the initiative or referred measure, or proposal to amend the constitution, or other question or proposal submitted, which has been declared carried, did not in fact receive the highest number of votes for the office or a sufficient number of votes to carry the measure, amendment, question or proposal.

A.R.S. § 16-672(A). Of course, the contester would need to demonstrate that the votes cast in this election were illegal and that there were enough illegal votes to change the election result. *See, e.g.*, *LaChance v. Cnty. of Cochise*, 553 P.3d 176, 184 (Ariz. App. 2024). In the instant case, such a showing would be impossible because the votes were not *illegally* cast, and there is zero evidence to suggest that any of those 20% who voted for two at-large candidates tilted toward or away from any particular candidate.

Nonetheless, it is impossible to enforce the Consent Decree on the 2024 General Election. State law has a remedy to permit litigating any irregularities in that same election, and for that reason, this Court should not develop a new procedure that exists outside of state law and the Consent Decree as a remedy for the County's oversight.

      **B.**      **This conclusion is consistent with restrictions on federal intervention.**

The Court has been presented with the question of whether Maricopa County's improper instructions and tabulation of votes cast for Phoenix Union High School District amounted to the type of error that warrants federal intervention. *See,* Notice of Position of Non-Party Aden Ramirez (Doc. 131). While the failure to comply with an in-force consent

decree is something more than "garden variety," the Court should also recognize that "[m]ere fraud or mistake will not render an election invalid." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). No party has asserted that Maricopa County's error is intentional, much less fraudulent.

But federal precedent requires even more than fraud; "significant disenfranchisement that results from a change in the election procedures," *id.* at 1226-1227, is required to justify federal intervention. Examples of the error that would trigger a federal court's intervening in a state's administration of elections include failing to hold a required election, "outrageous racial discrimination" resulting in a complete "lack of integrity" in the election, and deliberate efforts by officials to block an honest count of the ballots cast. *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1096–97 (9th Cir. 2024) (collecting cases). The inadvertent failure to adhere to the Consent Decree in this particular election does not reach the threshold of errors that have motivated other federal courts to intervene in state election procedures.

    **C.**   **The Consent Decree and the Voting Rights Act seek to remedy historic disenfranchisement of Black and Hispanic voters.**

During the Court's October 23, 2024, hearing on this matter, some discussion was had concerning, essentially, whether White voters' ability to select a candidate of their choosing should be evaluated in assessing the remedy in this matter. It should not. The plain language of the Voting Rights Act and the Consent Decree make clear that their purpose is addressed at historic disenfranchisement of racial minorities.

1       Indeed, in overruling the application of Section 5, the United States Supreme Court 2 explicitly addressed voter registration figures for Black and Hispanic voters and quoted 3 the Congressional record around reauthorization noting, "[s]ignificant progress has been 4 made in eliminating first generation barriers experienced by minority voters, including 5 increased numbers of registered minority voters, minority voter turnout, and minority 6 representation in Congress, State legislatures, and local elected offices." *Shelby Cnty.*, 570 7 U.S. at 547 (quoting § 2(b)(1), 120 Stat. 577). Minority as used in the context of the Voting 8 Rights Act relates to African-American and Hispanic racial and ethnic minorities. *Id.* 9 (citing H.R.Rep. 109–478, at 12 (2006), 2006 U.S.C.C.A.N. 618, 627).

10       This is not intended to suggest that the Consent Decree is unnecessary for all 11 elections going forward. Rather, applying the criteria previously examined by the 12 Department of Justice under the preclearance regime, and examining the nature of the evil 13 targeted by the text of the Consent Decree, it is clear that in this case, in this election, the 14 goals of both the Decree and the Voting Rights Act have been satisfied.

15     **III.   Conclusion**

16       For the foregoing reasons, Candidate Francisco Pastor-Rivera urges the Court to 17 permit the current election results to stand, and to not create a procedure for a special 18 election.

19 / / /

20 / / /

21 / / /

RESPECTFULLY submitted this 26th day of November 2024.

**BARTON MENDEZ SOTO PLLC**

By: /s/ James E. Barton II
James E. Barton, II
Jacqueline Mendez Soto
Daniella Fernandez Lertzman
*Attorneys for Francisco Pastor-Rivera*

**Notice of Electronic Filing and Certificate of Service**

I certify that I electronically filed the foregoing with the Clerk of the Court on November 26, 2024, for filing and uploading to the CM/ECF system. Counsel for all parties who have appeared are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

*s/ Rosa Torres*
Rosa Torres, Paralegal